# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 02: 08-cr-0398 |
| | ) | |
| JAWAN BARNETT COACHMAN | ) | |
| a/k/a Darryl Clark | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the JAWAN BARNETT COACHMAN'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS WITH CITATION OF AUTHORITY, filed on behalf of Defendant Jawan Barnett Coachman on November 19, 2009, docket entry number 36 (Doc. # 36), and GOVERNMENT'S RESPONSE TO DEFENDANT'S DISCOVERY MOTIONS filed by the United States on December 11, 2009, (Doc. # 37).  On November 20, 2009, an evidentiary hearing was ordered to consider the motion, and the hearing was conducted on January 4, 2010.  All parties were represented by counsel who presented and argued the issues skillfully and effectively.  The motion is now ripe for disposition.

Based on the testimony and evidence presented during the suppression hearing and the applicable law, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Criminal Procedure 12(d).  For the reasons that follow, the Motion is **DENIED.**

## FINDINGS OF FACT

In the afternoon of January 8, 2008, Defendant was operating a silver Ford Taurus and driving southbound along Blackadore Avenue in the Homewood section of Pittsburgh. Blackadore Avenue is a two lane paved road, with space for parking available along both sides of the road.  Ferndale Street is an unmarked paved road and generally proceeds in an east-to-

west direction.  Ferndale Street intersects Blackadore at a four-way intersection controlled by stop signs.  There are no lines painted on the surface of Blackadore Avenue to indicate the points where cars are required to stop in compliance with the stop signs.  At approximately 2:51 p.m., officers of the City of Pittsburgh Bureau of Police, Narcotics Division, stopped the Defendant's vehicle.  The basis for the stop was due to the Defendant's alleged failure to have made a complete stop at the stop sign at the intersection of Blackadore and Ferndale.

Detectives Charles Higgins, Michael Molitaris, and Jason Moss were the law enforcement officers involved in the stop and subsequent arrest of Defendant.  At the time of the alleged traffic infraction, all three were in an unmarked police car, with Detective Higgins driving, Molitaris in the front passenger seat, and Moss in the back seat.  The police vehicle was proceeding eastbound along Ferndale Street.  By way of general orientation, Ferndale Street is a relatively short cross street that connects Wheeler Street/North Wheeler Drive on the eastern side with Lawndale Street on the western side.  The respective ends of Ferndale are at higher elevations than the center portion where the street intersects with Blackadore.  The detectives' vehicle entered Ferndale Street from Wheeler Street and was approaching, but had not yet reached, the intersection with Blackadore when they saw Defendant's vehicle slowing as it approached the stop sign and proceeded through the intersection, across their field of vision, without stopping.  All three detectives testified that Defendant's vehicle slowed as it passed the stop sign, but failed to stop completely, essentially "rolling through" the stop sign, to use the phrase of choice of the witnesses.  While there was no precise measurement of the police vehicle

from the intersection at the time Defendant's vehicle was observed, the testimony of each detective placed the police vehicle well within 50 feet of the intersection.[1]

Beyond the intersection, Defendant continued south along Blackadore Avenue. The police vehicle turned from Ferndale Street onto Blackadore Avenue and began to close the distance between itself and Defendant. Defendant subsequently executed two additional turns, ultimately traveling approximately a half a mile, before being stopped by the detectives.[2]

After stopping Defendant's vehicle, Detective Higgins approached the driver's side window and asked for Defendant's driver's license. At the same time, Detectives Molitaris and Moss approached the passenger side of the vehicle. Defendant responded that he did not have his license with him. When asked what his name was, Defendant responded "Darryl Clark", which is not his name but that of an acquaintance. When asked whether he had any form of identification with him, Defendant responded that he did not. Defendant was asked to step outside of the vehicle, which he did. As he did so, and without being asked or prompted in any way, Defendant informed the detectives words to the effect of, "I have warrants", and provided his actual name and an expired driver's license. Detective Higgins confirmed that a warrant did

---

[1]    While each detective described the distance somewhat differently, the testimony regarding the span of distance, namely the relatively close proximity of the police vehicle with the intersection, was consistent. Detective Higgins described the distance of the police vehicle as being "within the same block" of the intersection. Detective Molitaris described the distance as between "fifteen to twenty five feet". Detective Moss testified that the police vehicle was approximately "three to four car lengths" from the intersection.

[2]    The Court notes that according to the testimony of all witnesses, despite the distance from the observed infraction to the site of the stop, Defendant was not exceeding the speed limit at any point. Similarly, there is no evidence to suggest any attempt on Defendant's part to evade the police vehicle. Detective Higgins testified that the passage of time between observing the infraction and stopping Defendant was spent simply "catching up to him."

exist, and  Defendant was arrested.  Pursuant to a search of his person incident to the arrest, the

detectives seized, *inter alia*, a plastic bag containing crack cocaine from Defendant's pocket,

cash in the amount of $657.00, and a cell phone that rang "continuously" throughout the time of

the traffic stop and arrest.  Defendant informed the detectives that he also had a "gun" in the

vehicle.  Defendant was asked for permission to retrieve the weapon from the vehicle, which

was given.  Detective Moss retrieved the weapon from the map pouch on the backside of the

passenger seat, a nine millimeter semi-automatic pistol with thirteen (13) rounds in the

magazine and one round in the chamber.  This weapon is the one forming the basis of the

indictment *sub judice*.

Defendant challenges the basis for the traffic stop.  Defendant testified on his own

behalf at the evidentiary hearing that he did in fact stop prior to passing beyond the stop sign,

and that it is his habit to stop for four seconds at stop signs before proceeding, which he did in

this instance.  Defendant further testified that upon resuming his forward progress, he proceeded

slowly through the intersection to ensure that no other vehicle would cross the intersection and

collide with his.  The Defendant testified that at the point where he stopped, foliage on the

corner to his right completely obscured his view up Ferndale in the direction of the detectives'

vehicle, and that it was not until after he proceeded beyond the stop sign that he was able to see

the police vehicle.

In support of the his claim that the portion of Blackadore Avenue where he stopped

was obscured from the detectives' observation, Defendant admitted a series of photographs of

the intersection and video footage taken from the front passenger seat of a vehicle traveling east

to west along the entire distance of Ferndale Street, to include traversing the intersection with

Blackadore Avenue.  To summarize the general content of the footage, admitted as Defendant's Exhibit 16, it was taken from the perspective of a vehicle traveling along Ferndale Street, and was recorded by a camera operator seated in the front passenger seat.  With respect to the route, the footage recorded the vehicle as it entered the eastern side of Ferndale from Wheeler Street, proceeding across the intersection with Blackadore Avenue, continuing to Lawndale Street on the western side, turning around, and returning to the eastern side of Ferndale.

   With his testimony, Defendant made various admissions, to include: admitting that his driver's license was expired at the time of the stop; admitting that he was aware at the time that he did not have a valid driver's license; admitting that when asked by Detective Higgins whether he had any identification on his person, he falsely responded that he did not, despite knowing that his expired driver's license was in his pocket at the time; admitting that he intended to sell the crack cocaine found in his pocket; and admitting that he was aware of the loaded nine millimeter semi-automatic pistol that was in the map pouch behind the passenger seat of his vehicle.  Defendant initially provided a false name to the police because he knew Darryl Clark to have both a valid driver's license and a license to possess a firearm.

## CONCLUSIONS OF LAW

   On November 18, 2008, a federal grand jury returned a one-count Indictment against Defendant in which he was charged with possession of a firearm by a convicted felon, on or about January 8, 2008, in violation of 18 U.S.C. § 922(g)(1).  Doc. # 1.  Defendant made his initial appearance on January 7, 2009.  Doc. # 7.   An arraignment and detention hearing was held the following day on January 8, 2009, before United States Magistrate Judge Amy Reynolds Hay, at which time the government requested that the Defendant be detained without

bond pending trial in accordance with the Bail Reform Act, 18 U.S.C. §§ 3141, *et. seq.*  The

magistrate judge granted the government's motion and ordered that Defendant be detained

pending further disposition of this matter. Doc. # 20.

Defendant has filed the instant motion in which he requests that the Court suppress

the evidence seized in the course of the traffic stop on the basis that the police had no probable

cause or reasonable suspicion to stop his vehicle.  Doc. # 36, Mot. at Part II.  In support of this

position, Defendant argues, in both his motion and with his testimony, that he did come to a

complete stop at the stop sign.

The Fourth Amendment guarantees that the "right of the people to be secure in their

persons, houses, papers and effects against unreasonable searches and seizures, shall not be

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched and the persons or things to be

seized."  U.S. Const., amend. IV.  Stopping a car and detaining its occupants is considered a

"seizure" and, therefore subject to protections of the Fourth Amendment, including a

requirement of reasonableness under the circumstances.  *United States v. Hensley*, 469 U.S. 221,

226 (1985).

"As a general matter, the decision to stop an automobile is reasonable where the

police have probable cause to believe that a traffic violation has occurred."  *Whren v. United*

*States*, 517 U.S. 806, 810 (1996); *see also Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

Particularly in Pennsylvania, under section 6308(b) of the Pennsylvania Vehicle Code, any

police officer who has reasonable and articulable grounds to believe that a vehicle or driver is in

violation of the Vehicle Code may stop the vehicle.  75 Pa. C.S.A. § 6308(b); s*ee also United*

*States v. Johnson*, 63 F.3d 242, 245 n.2 (3d Cir. 1995); *Commonwealth v. Benton*, 440 Pa.Super. 441, 655 A.2d 1030, 1033 (1995).  Although an actual violation need not be established, a reasonable basis for the officer's belief is required to validate the stop. *See United States v. Johnson*, 63 F.3d at 245, n.2 (citations omitted).

After a justifiable traffic stop has been initiated, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of the inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation. *See United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003); *see also United States v. Johnson*, 285 F.3d 744, 749 (8ᵗʰ Cir. 2002).  While "reasonable suspicion" must be more than an inchoate "hunch", the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop.  *See United States . Sokolaw*, 490 U.S. 1, 13, 109 S.Ct. 1581, 1585 (1989); *see also United States v. Givan*, 320 F.3d at 458.  Whether a reasonable and articulable suspicion exists turns on an objective assessment of the totality of the circumstances. *United States v. Sokolow,* 490 U.S. at 8.

Here, all three detectives testified that the Defendant was stopped because, based on each of their individual observation, Defendant appeared to proceed through the stop sign without coming to a complete stop, an offense violative of the Pennsylvania Vehicle Code.  *See* 75 Pa. C.S.A. § 3323(b), which states:

> **(b) Duties at stop signs.--**Except when directed to proceed by a police officer or appropriately attired persons authorized to direct, control or regulate traffic, every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line or, if no stop line is present, before entering a crosswalk on the near side of the intersection or, if no crosswalk is present, then at the point nearest the intersecting roadway where the driver has a clear view of approaching traffic on the intersecting roadway before entering. If, after stopping at a crosswalk or clearly marked stop line,

a driver does not have a clear view of approaching traffic, the driver shall, after yielding the right-of-way to any pedestrian in the crosswalk, slowly pull forward from the stopped position to a point where the driver has a clear view of approaching traffic. The driver shall yield the right-of-way to any vehicle in the intersection or approaching on another roadway so closely as to constitute a hazard during the time when the driver is moving across or within the intersection or junction of roadways and enter the intersection when it is safe to do so.

The Court finds that reasonable suspicion existed to permit the traffic stop of Defendant. The three detectives testified credibly to seeing Defendant's vehicle approach the stop sign, slow down, and proceed through the intersection without coming to a complete stop. The police vehicle was located in close proximity to the intersection, and both the intersection and sign were visible. The Court finds that while some foliage existed on the corner of the intersection, it was not at such a height or size to conceal the area in and around the stop sign from the vantage point of the detectives' vehicle.

Both the verbal testimony of the government witnesses and the other evidence admitted supports the Court's conclusion that the Defendant's vehicle was not only able to be observed by the detectives as it approached the intersection, but was in fact seen by the officers. As described herein, all three detectives credibly testified that the police vehicle was closer than 50 feet to the intersection at the moment they each witnessed Defendant's vehicle approach the stop sign, slow down, and proceed through the intersection without stopping. The Court further notes the visual evidence admitted on behalf of the Defendant himself, particularly the video footage admitted as Defendant's Exhibit 16. During the Defendant's direct examination of Robin Jackson, an Investigator with the Office of the Federal Public Defender, Defendant's Exhibit 16 was admitted. The footage was presented and displayed on video monitors in the courtroom. On a few occasions during the course of the video playback, the image was paused

by counsel for the Defendant, who used those occasions to ask questions of the witness.  When paused, the stayed image was clearly visible to the Court on the video monitors without any distortion.  In particular, the footage ended with a paused image at a point on the eastern side of Ferndale and facing the intersection, providing a view of the intersection at a point along that stretch traveled by the detectives' vehicle.   The witness, who was also the camera operator who recorded the footage, testified that the final paused image represented the view of the intersection from a distance of approximately 50 yards away and was where he was able to first see the stop sign.  From that vantage point, the intersection and the stop sign were clearly visible.  Likewise, the view was such that if a car approached the stop sign, it would be visible prior to it actually entering the intersection.  The Court further notes that Defendant's Exhibits 3, 4, and 8 closely approximate the view from Ferndale from the vicinity of the police vehicle as described by the detectives, which further support the Court's determination that Defendant's vehicle was visible as it approached the stop sign.

Even assuming, *arguendo*, that Defendant's testimony regarding coming to a complete stop was truthful, his testimony essentially admits violating that portion of the Vehicle Code for which he was stopped.  At intersections in which no stop line exists, such as the Blackadore/Ferndale intersection, drivers are required to stop "at the point nearest the intersecting roadway *where the driver has a clear view of approaching traffic on the intersecting roadway before entering*".  75 Pa. C.S.A. § 3323(b)(emphasis added).  Through his own testimony, Defendant admits that he did not do so.  Specifically, Defendant testified that after coming to a complete stop, he "rolled up a little bit to make sure there was nothing coming right or left, then [he] proceeded down Blackadore."  He further testified that where he stopped on

9

Blackadore in response to the stop sign, he could not see "up Ferndale" to his right.  To be clear, the Court does not have to determine whether Defendant did, in fact, violate the Vehicle Code in order to validate the traffic stop, nor do police officers.  The only question is whether, under the totality of the circumstances, the police had a reasonable suspicion to conclude that a traffic violation occurred.  Given the evidence presented at the hearing, there is no basis for the Court to conclude otherwise.  Defendant admitted "rolling through" the intersection, with the caveat that he also came to a full stop unbeknownst to the detectives. That claim does nothing to defeat the detectives' reasonable suspicion.

As such, the Court finds and rules that the stop was reasonable under the Fourth Amendment because Detectives Higgins, Molitaris, and Moss each had a reasonable and articulable suspicion that the vehicle or driver was in violation of the Pennsylvania Vehicle Code.

**Conclusion**

For the reasons hereinabove stated, the Motion to Suppress filed by Defendant will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 02: 08-cr-0398 |
| | ) | |
| JAWAN BARNETT COACHMAN | ) | |
| a/k/a Darryl Clark | ) | |

**ORDER OF COURT**

AND NOW, this 20th day of January, 2010, upon consideration of JAWAN

BARNETT COACHMAN'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

WITH CITATIONS OF AUTHORITY (*Document No. 36*) and after an evidentiary hearing in

accordance with the foregoing Findings of Fact and Conclusions of Law, it is hereby

**ORDERED**, **ADJUDGED, AND DECREED** that said Motion to Suppress Evidence is

**DENIED**.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:     Almon S. Burke , Jr.
        Assistant United States Attorney
        Email: almon.burke@usdoj.gov

        Marketa Sims,
        Assistant Federal Public Defender
        Email: marketa_sims@fd.org

11